**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| SAMANTHA CLARK, ) | CASE NO. 5:12-CV-0046 |
|  ) |  |
|  Plaintiff,  ) |  |
|  ) | MAGISTRATE JUDGE |
|  v.  ) | VECCHIARELLI |
|  ) |  |
| MICHAEL J. ASTRUE, ) |  |
|  Commissioner of Social Security, ) |  |
|  ) | **MEMORANDUM OPINION AND** |
|  Defendant.  ) | **ORDER** |

Plaintiff, Samantha Clark ("Plaintiff"), challenges the final decision of Defendant, Michael J. Astrue, Commissioner of Social Security ("Commissioner"), denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 423 and 1381(a).  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

**I.   PROCEDURAL HISTORY**

On August 11, 2009, Plaintiff filed her application for SSI and alleged a disability onset date of August 4, 2009.  (Transcript ("Tr.") 14.)  The application was denied

initially and upon reconsideration, so Plaintiff requested a hearing before an administrative law judge ("ALJ"). (Tr. 14.) On April 19, 2011, an ALJ held Plaintiff's hearing. (Tr. 14.) Plaintiff participated in the hearing, was represented by counsel, and testified. (Tr. 14.) A vocational expert ("VE") also participated and testified. (Tr. 14.) On May 10, 2011, the ALJ found Plaintiff not disabled. (Tr. 24.) On November 30, 2011, the Appeals Council declined to review the ALJ's decision, so the ALJ's decision became the Commissioner's final decision. (Tr. 1.)

On January 9, 2012, Plaintiff filed her complaint to challenge the Commissioner's final decision. (Doc. No. 1.) On June 11, 2012, Plaintiff filed her Brief on the Merits. (Doc. No. 14.) On July 25, 2012, the Commissioner filed his Brief on the Merits. (Doc. No. 15.) On July 26, 2012, Plaintiff filed a Reply Brief. (Doc. No. 18.)

Plaintiff asserts that the ALJ's decision is not supported by substantial evidence because ALJ erred in: (1) failing to consider the total limiting effects of Plaintiff's impairments in determining her RFC; (2) failing to provide good reasons for the weight assigned to the medical opinions of Plaintiff's treating physicians; and (3) relying on a flawed hypothetical to conclude that Plaintiff was capable of performing her past relevant work. The Commissioner argues that the ALJ's conclusions are supported by substantial evidence in the record.

## II. EVIDENCE

### A. Personal and Vocational Evidence

Plaintiff was 38 years old on her alleged disability onset date. (Tr. 22.) She completed the tenth grade, and was able to communicate in English. (*Id.*) She had past relevant work as a housekeeper/cleaner and a silk-screen printer. (*Id.*)

2

**B.     Medical Evidence**[1]

**1.     Treating Providers**

On April 28, 2009, Plaintiff reported to her primary care physician, Dai Kohara, D.O., that she was experiencing moderate constant pain and numbness throughout her body.  (Tr. 294-95.)  Dr. Kohara diagnosed Plaintiff with a sprained neck and gave her an injection of Depomedrol, an anti-inflammatory.  (Tr. 296.)  On May 1, 2009, Plaintiff presented to the emergency room at Akron General Medical Center, complaining of numbness and slurred speech.  (Tr. 268-72.)  She was advised to obtain further evaluation, including possible MRIs of her spine.  (Tr. 271.)  On May 19, 2009, neurologist Lawrence M. Saltis, M.D., performed nerve conduction studies, an EMG of Plaintiff's upper extremities, and a bed side examination, and opined that her symptoms made him "very suspect of a demyelinating disease of the MS type."  (Tr. 343-44.)

On June 24, 2009, Plaintiff underwent a brain MRI ordered by Dr. Kohara, which revealed signs of a demyelinating disease, as well as a cervical MRI, which revealed signs of a demyelinating plaque on her central cervical cord.  (Tr. 359-60.)

On July 15, 2009, Plaintiff began treating with a new primary care physician, Ruchi Taliwal, M.D., who noted Plaintiff's complaints of numbness and tingling.  (Tr. 444.)  On August 4, 2009, neurologist Jay P. Berke, M.D., diagnosed Plaintiff with

---

[1]   The ALJ determined that, although Plaintiff had been diagnosed with depression and anxiety, these mental impairments did not result in more than minimal limitations.  (Tr. 16.)  Plaintiff does not challenge the ALJ's determination on this issue in her Brief.  Accordingly, discussion of the medical evidence will generally be limited to evidence related to Plaintiff's physical impairments.

3

multiple sclerosis, noting that she had both Lhermitte's and Uhthoff's phenomenons.[2] (Tr. 341-42). Dr. Berke ordered cerebrospinal fluid ("CSF") exam. (Tr. 342.) On September 17, 2009, after Plaintiff's CSF exam revealed abnormally high levels of immunoglobulin G ("IgG"), Dr. Berke prescribed Copaxone injections, and directed her to return in four months or as needed. (Tr. 413.) He noted that her coordination and gait were normal, and that she was able to perform tandem, toe and heel walk. (*Id.*)

After a January 12, 2010 examination, Dr. Berke noted that Plaintiff was asymptomatic with respect to her multiple sclerosis, but complained of chronic headaches and skin issues at the site of Copaxone injections. (Tr. 412.) On January 13, 2010, Plaintiff complained to Dr. Taliwal of headaches related to stress and shortness of breath. (Tr. 440.) Dr. Taliwal diagnosed her with hyperlipidemia, gastroesophageal reflux disease ("GERD") and chronic obstructive pulmonary disease ("COPD"). (*Id.*) On April 7, 2010, Plaintiff reported increasing skin issues to Dr. Berke, who prescribed Rebif in place of Copaxone to treat her multiple sclerosis. (Tr. 485-86.) She also reported chronic daily headaches. (*Id.*)

On June 16, 2010, Dr. Berke noted that Plaintiff had "generalized pain, weather influenced." (Tr. 479.) He referred her to a rheumatologist to assess Plaintiff for fibromyalgia. (*Id.*) On June 17, 2010, rheumatologist James R. Goske, M.D., examined Plaintiff. (Tr. 475-76.) Plaintiff complained of constant headaches, neck discomfort,

---

[2] Lhermitte's sign is defined as "the development of sudden, transient, electric-like shocks down the body when the patient flexes the head forward; seen mainly in multiple sclerosis but also in compression and other disorders of the cervical cord." *Dorland's Illustrated Medical Dictionary* 1700 (Saunders, 30th ed. 2003). Dr. Berke's assessment characterizes Uhthoff's phenomenon as an increase in Plaintiff's numbness when she takes a hot shower. (Tr. 341.)

pain in her left hip, elbow and forearm pain, and all over aching. (Tr. 475.) Dr. Goske diagnosed Plaintiff with athralgia, myalgia and other malaise and fatigue. (Tr. 476.) A June 22, 2010 x-ray of Plaintiff's left hip and pelvis revealed no acute findings. (Tr. 473.)

On October 27, 2010, Dr. Taliwal noted Plaintiff's complaints of neck pain and cervical pain radiating into both shoulders.[3] (Tr. 494.) Dr. Taliwal instructed Plaintiff to obtain an x-ray of her neck. (*Id.*) A November 12, 2010 x-ray of Plaintiff's complete cervical spine revealed some narrowing at her C5-C6 vertebrae. (Tr. 493.) On January 10, 2011, Dr. Taliwal diagnosed Plaintiff with cervical strain and prescribed physical therapy. (Tr. 492.)

On January 21, 2011, Dr. Berke noted that Plaintiff complained of generalized discomfort, fatigue, skin issues at the site of her injections, and a 30-pound weight gain. (Tr. 502.) On February 7, 2011, Dr. Taliwal noted that Plaintiff was going to begin her physical therapy the next week. (Tr. 487.) On July 11, 2011, Plaintiff complained to Dr. Berke of episodic extremity pain. (Tr. 510.) Dr. Berke observed that Plaintiff's gait was independent and facile, and that her coordination and reflexes were normal. (*Id.*)

### 2. Agency Assessments

On December 2, 2009, agency medical consultant Cindi Hill, M.D., completed a residual functional capacity ("RFC") assessment, and opined that Plaintiff could

---

[3] Dr. Taliwal's October 27, 2010 entry suggests that Plaintiff was examined to follow up on her complaints of neck pain, and that Dr. Taliwal had previously asked Plaintiff to obtain an x-ray, which Plaintiff did not do. (Tr. 494.) However, the record contains no prior entry from Dr. Taliwal referencing Plaintiff's complaints of neck pain, or indicating that she was instructed to obtain an x-ray of her neck.

occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday, and sit (with normal breaks) for about six hours in an eight-hour workday. (Tr. 387-88.) Dr. Hill concluded that Plaintiff had an unlimited ability to push and/or pull. (Tr. 388) Dr. Hill determined that Plaintiff would occasionally climb ramps and stairs and balance, but could never climb ladders, ropes or scaffolds. (Tr. 389.) Dr. Hill made no findings with respect to Plaintiff's ability to stoop, kneel, crouch or crawl, and found that Plaintiff had no manipulative, visual, communicative or environmental limitations. (Tr. 389-91.)[4]

## C. Hearing Testimony

### 1. Plaintiff's Hearing Testimony

Plaintiff testified as follows at her hearing: She lived with her fiancé and her five-year old son in a two-story home with a basement. (Tr. 37.) Her three older children – two teenage girls and a boy – stayed with her every other week. (Tr. 37-38). On some days, she went downstairs to the basement up to four times; other days she avoided doing so. (Tr. 37-38.) She didn't "do much" on a typical day, as she experienced a lot of pain, fatigue, mood swings, and depression. (Tr. 40.) She experienced "the shakes" and jitters all day. (*Id.*) She might occasionally sweep and wash clothes on "a good day," although her fatigue required her to nap every day. (*Id.*) She could use a light

---

[4] Plaintiff was examined on November 17, 2009, by psychologist E.M. Bard, Ph.D., at the request of the Bureau of Disability Determination ("BDD"). (Tr. 381-86.) On December 15, 2009, state agency consultant Joan Williams, Ph.D., conducted a psychiatric review technique. (Tr. 395-408.) On May 11, 2010, state agency consultant Marianne Collins, Ph.D., reviewed Dr. Williams's findings. (Tr. 454.) None of these providers opined regarding Plaintiff's physical limitations.

vacuum, but did not mop. (Tr. 42.) Plaintiff did not participate in any of her children's school activities, and generally did not want to "do anything or associate with anybody." (Tr. 40.) Plaintiff took showers as opposed to baths, and had trouble washing her hair and bending over in the shower. (Tr. 41) Her arms cramped and tingled if she held them above her head for too long. (Tr. 41.) Her toes cramped if she placed them up on the side of the tub. (*Id.*) She occasionally cooked simple meals. (*Id.*) Plaintiff also cared for her pet hamsters, of which she had owned as many as 18. (Tr. 56.)

Plaintiff was unable to work due to her pain, depression, fatigue, flu-like symptoms, jitters and shakes, and headaches. (Tr. 46.) She attributed these problems to multiple sclerosis and a narrowing of her spine. (*Id.*) Plaintiff was receiving injection of Rebif three times each week to treat her multiple sclerosis, and was undergoing physical therapy three times every other week to treat her spine. (Tr. 46-47.)

### 2. Vocational Expert's Hearing Testimony

The ALJ posed the following hypothetical to the VE:

> Please assume an individual who was born on January 11, 1971, who completed the tenth grade in regular classes, and who has [past relevant work experience as a housekeeper/cleaner and silkscreen printer]. . . . [P]lease assume that she has the physical capabilities and restrictions stated by Dr. Hill [in her December 2, 2009 assessment] . . . . Based on [this hypothetical], could such an individual perform either of the two occupations to which you've testified as past work?

(Tr. 61-62.) The VE opined that the hypothetical individual described by the ALJ could perform work as either a housekeeper/cleaner or a silkscreen printer. (Tr. 62.) The VE also opined that the hypothetical individual could perform work as a mail clerk, stock marker or car wash attendant. (Tr. 62-63.)

7

The ALJ posed a second hypothetical to the VE, based on the first hypothetical, but adding the limitations that the individual could frequently stoop, but could only occasionally kneel, crouch and crawl; could not work in extremes of cold, heat or humidity; had to avoid concentrated exposure to noise, vibration and respiratory irritants; could not work at unprotected heights or around dangerous machinery . (Tr. 63-64.)  Additionally, this second hypothetical individual was limited to simple, routine, repetitive tasks at a Specific Vocational Preparation ("SPV") level of three, involving only simple, work-related decisions and, in general, relatively few workplace changes, and that did not require substantial negotiation, persuasion or conflict resolution. (Tr. 64.) The VE opined that, while the second hypothetical individual could not work in Plaintiff's past positions, that individual could work as a surveillance system monitor, an unskilled assembler, or an unskilled cashier, excluding supermarket cashiers. (Tr. 64-65.)

The ALJ asked whether the individual from the second hypothetical who was additionally limited to sedentary work could work in either of Plaintiff's prior positions. (Tr. 66-67.)  The VE responded that this third hypothetical individual could not work in either position, but could work as a surveillance system monitor, an unskilled assembler, or a jewel stringer. (Tr. 67.)  In response to questioning by the ALJ, the VE opined that an individual who was off task for 20 percent of the workday, or who would miss three days of work per month, could not sustain substantial gainful activity. (Tr.68.)  Finally, after cross-examination, and in response to further questioning by the ALJ, the VE replaced surveillance system monitor with telemarketer as work that the individuals described in the ALJ's second and third hypotheticals could perform. (Tr. 75-76.)

8

### III.     STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a).

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan,* 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot,* 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does

prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

### IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since August 11, 2009, the application date.

2. The claimant has the following severe impairments: early multiple sclerosis, mild degenerative disc disease and spondylosis of the cervical spine, headaches and chronic obstructive pulmonary disease, asthma, and allergic rhinitis with a history of smoking.

3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

4. The claimant has the residual functional capacity to perform a range of light work as defined in 20 CFR 416.967(b).  She can lift and/or carry 20 pounds occasionally and 10 pounds frequently.  She can stand and/or walk (with normal breaks) for about six hours in an eight-hour workday.  She has no restrictions in her ability to push and/or pull, including the operation of hand and/or foot controls, other than as restricted by her limitations on lifting/carrying.  She can occasionally climb ramps and stairs.  She can never climb ladders, ropes and scaffolds.  She can occasionally balance.  She is limited to simple, routine, repetitive tasks at no more than an SVP level of 3, involving only simple, work-related decisions and in general relatively few workplace changes.  She cannot do a job that requires her to engage in substantial negotiation, persuasion or conflict resolution.

5. The claimant is capable of performing past relevant work as a housekeeper/cleaner and silk-screen printer.  This work does not require the performance of work-related activities precluded by claimant's residual functional capacity.

6. The claimant has not been under a disability, as defined in the Act, since August 11, 2009, the date the application was filed.

## V. LAW & ANALYSIS

### A. Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. *Id.* However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

### B. Plaintiff's Assignments of Error

#### 1. The Total Limiting Effects of Plaintiff's Impairments

Plaintiff argues that the ALJ erred in failing to address limitations to her ability to stoop, kneel, crouch or crawl, as well environmental restrictions, which were evident from the medical records.  Specifically, Plaintiff argues that both the ALJ and Dr. Hill – the agency reviewing physician who conducted Plaintiff's RFC assessment – failed to make findings regarding Plaintiff's ability to stoop, kneel, crouch or crawl.  She also asserts that it is evident the ALJ was aware that these postural limitations were relevant to the RFC because, during Plaintiff's hearing, the ALJ posed hypotheticals to the VE that included these limitations.  The Commissioner responds that the ALJ's assessment of Plaintiff's RFC is supported by substantial evidence in the record, and that Plaintiff failed to sustain her burden of establishing that these limitations should be included in her RFC.

Plaintiff's arguments on this point are not well taken.  She points to no medical evidence in the record establishing limitations on her ability to stoop, kneel, crouch or crawl.  She does not allege that she offered any such evidence, but, rather, argues that the agency or the ALJ erred in failing to consider these limitations.  It is well established that the claimant bears the burden of establishing the impairments that determine her RFC.  *See* Her v. Comm'r of Soc. Sec., 203 F.3d 388, 391 (6th Cir. 1999) ("The determination of a claimant's Residual Functional Capacity is a determination based upon the severity of his medical and mental impairments. This determination is usually made at stages one through four [of the sequential process for determining whether a claimant is disabled], *when the claimant is proving the extent of his impairments.*") (emphasis added).  Further, the fact that the ALJ posed hypotheticals to the VE that included these limitations is not relevant.  Rather, the issue for this Court is whether

12

substantial evidence in the record supports the omission of limitations on Plaintiff's ability to stoop, kneel, crouch or crawl from her RFC.  Because Plaintiff failed to offer any evidence in support of her assertion that she is limited in her ability to stoop, kneel, crouch or crawl, she failed to sustain her burden of proving that these limitations were part of her RFC, and substantial evidence supports the ALJ's conclusion that Plaintiff had no limitations in these abilities.[5]

Plaintiff also argues that the ALJ erred in failing to address environmental limitations that were evident from the record.  Specifically, Plaintiff points to Dr. Berke's observations that hot shower water caused Plaintiff to experience generalized numbness, and that Plaintiff's generalized pain was "weather influenced."  These observations, however, do not constitute medical opinions regarding Plaintiff's abilities to withstand certain environmental conditions.  Plaintiff points to no evidence in the record suggesting that she is not capable of working in extreme heat, cold or humidity.  Accordingly, substantial evidence supports the RFC determined by the ALJ – without

---

[5] Because this Court concludes that substantial evidence supports the ALJ's omission of these limitations from Plaintiff's RFC, it is not necessary to address the Commissioner's alternative argument that, even if these limitations should be included in the RFC, the ALJ identified jobs that do not require Plaintiff to stoop, kneel, crouch or crawl.  It is worth noting, however, that the ALJ identified these positions without regard to whether they included these limitations.  It is well settled that "'an agency's action must be upheld, if at all, on the basis articulated by the agency itself.'" *Berryhill v. Shalala*, 4 F.3d 993, *6 (6th Cir. Sept. 16, 1993) (unpublished opinion) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 50 (1983) (citation omitted)).  Accordingly, this Court "may not accept appellate counsel's *post hoc* rationalizations for agency action." *Id.* (internal quotation marks omitted).

environmental limitations.[6]

### 2. The ALJ's Consideration of the Medical Evidence

Plaintiff argues that the ALJ erred in failing to provide good reasons for the weight given to the medical opinions of her treating physicians.  The Commissioner argues that Plaintiff did not offer any evidence that constituted a "medical opinion" from a treating physician, and, thus, the ALJ had no treating physician opinion to weigh.  As the ALJ noted in his decision, Plaintiff did not submit any disability narratives from her treating physicians.  (Tr. 21.)[7]  Plaintiff concedes as much, but argues that the ALJ erred in failing to discuss either the weight he assigned to the medical records from her treating physicians, or the "treating physician findings ascertainable from the plethora of other medical evidence that was submitted."  (Plaintiff's Brief ("Pl. Br.") at 14.)

Plaintiff's arguments on this point are not well taken.  Although it is well settled that a treating physician's medical opinion is generally entitled to controlling weight, *see* 20 C.F.R. § 404.1527(d)(2), in this case, Plaintiff failed to provide any evidence from her treating physicians that constituted a medical opinion as that term is defined in

---

[6] Plaintiff argues again that the ALJ must have been aware of her limited ability to work in extreme temperatures and humidity, noting that the ALJ posed a hypothetical to the VE that included limitations in this area.  However, as discussed above, the fact that the ALJ may have considered the possibility of this restriction in contemplating Plaintiff's RFC is not relevant.  Rather, the issue before this Court is whether substantial evidence supports the ALJ's conclusion regarding Plaintiff's RFC.

[7] Records from August and October 2010 appointments reflect that Dr. Taliwal completed disability paperwork for the Plaintiff.  (Tr. 495 ("She is here to have her disability paperwork filled out."), 494 ("We filled out disability forms.").)  In her December 2009 psychiatric review form, Dr. Williams noted, "One physician refused to fill out questionnaire sent by BDD, stating opinion that she did not believe the patient needed disability."  (Tr. 407.)

the regulations.  The relevant regulation defines "medical opinions" as "statements from physicians and psychologists or other acceptable medical sources *that reflect judgments about the nature and severity of your impairment(s)*." 20 C.F.R. § 416.927(a)(2) (emphasis added).  As other courts have observed, records that "merely list or summarize data from physical or laboratory tests" do not constitute medical opinions.  *Pethers v. Comm'r of Soc. Sec.*, 580 F. Supp. 2d 572, 579 (W.D. Mich. 2008).  Nor does a physician's listing of a claimant's self-reported symptoms.  See *Burden v. Astrue*, 588 F. Supp. 2d 269, 276 (D. Conn. 2008).  Here, Plaintiff points to nothing in the medical records that reflects a treating physician's judgment regarding the nature and severity of her impairments.[8]  Rather, Plaintiff suggests that the ALJ should have "ascertained" the treating physicians' findings from the "plethora" of medical evidence that was submitted on her behalf.  Although these records contain test results, her physicians' diagnoses, and observations regarding her complaints and symptoms, they do not contain any judgments about the nature and severity of her impairments or her ability to perform work.  Accordingly, they do not constitute medical opinions and the ALJ did not err in failing to discuss the weight that he assigned to them.

### 3.     The ALJ's Hypothetical

---

[8]  Plaintiff points specifically to the records from her exam by Dr. Goske, and notes that he diagnosed her with athralgia, myalgia, and other malaise and fatigue.  As a preliminary matter, given that Dr. Goske examined Plaintiff only once, he was likely a "nontreating source" under the relevant regulations.  *See* 20 C.F.R. § 416.902 (defining a "nontreating source" as "a physician . . . who has examined you but does not have, or did not have, an ongoing treatment relationship with you").  Moreover, although Dr. Goske diagnosed Plaintiff with various ailments, the records from his visit do not contain any judgment regarding the severity of any impairments resulting from those conditions.  (Tr. 476-77.)

Plaintiff argues that the ALJ relied on the VE's responses to a flawed hypothetical in concluding that she was capable of performing her past relevant work, as the hypothetical did not include limitations in her ability to stoop, kneel, crawl or crouch, or to withstand certain environmental conditions.[9] However, because, as discussed above, substantial evidence supports the RFC as determined by the ALJ, and because the hypothetical relied on by the ALJ comports with that RFC, this argument lacks merit.

## VI. CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED**.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: September 12, 2012

---

[9] Plaintiff also argues that the VE was not credible because he initially opined that an individual with the limitations described by the ALJ could work as a surveillance monitor, a position that has been the subject of some dispute in this Circuit. However, Plaintiff raised this argument for the first time in her Reply Brief. Accordingly, it is waived. *See, e.g., Scottsdale Ins. Co., Inc. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008).